UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN McALPINE,

     Plaintiff,                       Case No. 24-cv-

-vs-

THE UNIVERSITY OF MICHIGAN,     Hon.

     Defendant.

---

Jennifer Lossia McManus (P65976)
Ryan O. Rosenberg (P84530)
FAGAN MCMANUS, P.C.
Attorneys for Plaintiff
25892 Woodward Avenue
Royal Oak, MI  48067-0910
(248) 542-6300
jmcmanus@faganlawpc.com
rrosenberg@faganlawpc.com

---

## **COMPLAINT AND JURY DEMAND**

There is no other pending or resolved civil action
arising out the transaction or occurrence
alleged in the Complaint.

NOW COMES Plaintiff, KEVIN McALPINE, by and through his attorneys, FAGAN MCMANUS, P.C., and for his cause of action against Defendant, states as follows:

## JURISDICTIONAL ALLEGATIONS

1.      Plaintiff, KEVIN McALPINE (hereinafter referred to as "McAlpine" or "Plaintiff"), is an individual residing in the City of Warren, County of Macomb, State of Michigan.

2.      Defendant, THE UNIVERSITY OF MICHIGAN (hereinafter referred to as "U-M" or "Defendant"), is a public university located in the City of Ann Arbor, County of Washtenaw, State of Michigan.

3.      At all times pertinent hereto, McAlpine was employed by U-M at its Dearborn ("U-M-D") campus located in the City of Dearborn, County of Wayne, State of Michigan.

4.      The amount in controversy is in excess of $75,000.00, exclusive of interest, costs, attorney fees, and punitive damages.

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental).

## GENERAL ALLEGATIONS

6.      McAlpine is 57-year-old male that openly identifies as gay.

7.      On June 17, 2013, McAlpine began his employment with U-M-D in the position of Development Director Lead, also referred to as Senior Director of Development and Campaign Operations.

8.      McAlpine's sexual orientation was known to U-M throughout his

employment; McAlpine's husband was enrolled in benefits as his spouse with U-M throughout McAlpine's employment.

9.     Due to his excellent job performance, McAlpine was promoted to U-M-D's Assistant Vice Chancellor of Institutional Advancement, a role he was promoted to in 2016 and remained in through the end of his employment.

10.    In 2017, McAlpine was awarded the Victor's Valiant Award, which is one of the highest recognition awards given by U-M's Office of University Development.

11.    There was also a 4.5 month period where McAlpine served as the Interim Vice Chancellor of Institutional Advancement.

12.    In May 2019, McAlpine began to report to a new supervisor, Casandra Ulbrich ("Ulbrich"), who was hired into the position of Vice Chancellor of Institutional Advancement at U-M-D, for which McAlpine had served as the Interim.

13.    Shortly after Ulbrich's hire, McAlpine began to be mocked and ridiculed, and subjected to conduct such as being called "lady" during meetings, while he was the only male on the team, he was referred to as a lady with the rest of the female team.

14.    McAlpine repeatedly objected to being referred to as a "lady," to

3

which Ulbrich and other coworkers laughed, and said nothing in response, or denied it.

15.    However, the "lady" comments continued.

16.    In December 2019, McAlpine was diagnosed with a herniated disc and spinal cancer, requiring three surgeries, radiation, and ongoing cancer treatment.

17.    McAlpine took an approved medical leave from December 19, 2019 to May 8, 2020, pursuant to the Family Medical Leave Act ("FMLA") and as an accommodation for his disability.

18.    In addition, McAlpine further notified U-M that he would need continuing medical leaves/accommodations for ongoing medical treatment due to his disability, cancer, which was approved by Human Resources.

19.    On June 9, 2020, the day before McAlpine took a second approved medical leave for a spinal cancer treatment including surgery and radiation, Ulbrich emailed McAlpine an outline of his "primary responsibilities" for when he returned from leave, placing undue stress on McAlpine.

20.    From June 10, 2020 to September 30, 2020, McAlpine took an approved medical leave for treatment of his disability.

21.    When McAlpine returned from this medical leave, McAlpine

informed Human Resources and Ulbrich that he required MRIs and ongoing cancer treatment every three months for his disability.

22.   Although he used sick time for the MRI appointments, Ulbrich told McAlpine that "being off like this every three months" interfered with his ability to meet her expectations.

23.   On or about September 17, 2020, McAlpine and his spouse adopted their son, a special needs child, from foster care.

24.   McAlpine requested six paid weeks of leave (in three (3) two-week periods) in accordance in U-M's policy for adoption under the FMLA in order to bond with his newly adopted son, which was approved by Human Resources in April 2021.

25.   However, after notifying Ulbrich of his approved adoption/FMLA leave in April 2021, McAlpine was questioned by Ulbrich about his parental status and the validity of his adoption, and was denied his request for the three (3) two-week leave periods.

26.   McAlpine had two coworkers, a heterosexual female and a heterosexual male, who also requested parental leave in time in the months leading up to McAlpine requesting adoption//FMLA leave and these coworkers were not subject to such discriminatory questioning by Ulbrich.

27.   Ulbrich stated that McAlpine could instead take two (2) three-

week leave periods, which McAlpine took.

28.    In addition, while McAlpine was off work for medical or adoption/FMLA leave, he was assigned additional work by Ulbrich, which he completed while off on leave.

29.    McAlpine reported Ulbrich's harassment to U-M's Assistant Director for Academic Human Resources, Lisa Copeland ("Copeland").

30.    In response, Copeland suggested McAlpine talk to Ulbrich about the issues directly and suggested McAlpine talk to U-M-D's Director of Equity, Civil Rights, and Title IX. McAlpine did meet with the Director but there was no resolve.

31.    McAlpine did not receive a FY 2020 Annual Staff Performance Planning and Evaluation by Ulbrich because she said she was too busy to complete it. Thus, McAlpine received no feedback for that prior year, and no goal setting for the next fiscal year.

32.    In May 2021, Ulbrich recommended to McAlpine that he apply for an opening for Vice Chancellor at U-M's Flint campus, stating she would help McAlpine get the job. McAlpine did apply for the position but was not selected.

33.    From June 17, 2021, to July 8, 2021, McAlpine took the first half (three weeks) of the pre-approved adoption/FMLA leave.

34.    In July 2021, Ulbrich downgraded some of McAlpine's job responsibilities, including his secondary title of Chief Development Officer, to Director, which removed McAlpine from important U-M Office of University Development communications related to fundraising and, accordingly, opportunities for more prospects.

35.    McAlpine took the second half of the adoption/FMLA leave on August 16, 2021, through September 3, 2021.

36.    In August 2021, McAlpine received a merit raise.

37.    In the same month, on August 12, 2021, McAlpine received his FY 2021 Annual Staff Performance Planning and Evaluation rating by Ulbrich. Ulbrich rated him an overall "Approaching" rating, which he disagreed with.  Approaching is the rating level between "Solid Performance" and "Not Met."

38.    Despite the "Approaching" rating, McAlpine surpassed the following performance goals for FY 2021, despite being on medical leave for three months, undergoing treatment for cancer, and taking six weeks of adoption/FMLA leave:

    a)  Goal: "Raise $500,000 by June 30, 2021 [prorated to $375,000]"

        i.  Surpassed: McAlpine raised $473,086.

    b)  Goal: "85 'Donor Visits' by June 30, 2021"

7

       i.  Surpassed: McAlpine had nearly 100 'Donor Visits.'

  c) Goal: 15 'Major Gift Asks' by June 30, 2021"

       i.  Surpassed: McAlpine had 30 "Primary Asks" accepted and 2 "Team Asks" accepted, asking for $4,891,535.

  d)  Goal: "Maintain engagement score of at least 75% each month"

       i.  Surpassed: McAlpine was at 80% or higher every month.

39.   In September 2021 (FY 2022), McAlpine secured an $8 million dollar gift for U-M-D which surpassed his FY 2022 goal of $1 million. This was one of the largest gifts in U-M-D's history and one in which he worked on while on adoption/FMLA leave.

40.   On January 14, 2022, Ulbrich placed McAlpine on a Performance Improvement Plan ("PIP"), despite the absence of any progressive discipline leading up to it.

41.   One of the PIP requirements was that McAlpine create a "strategic vision" for major gifts at U-M-D.

42.   Over the subsequent months, McAlpine worked extremely hard to meet all of Ulbrich's requirements in the PIP. In fact, he created six different "strategic visions" for Ulbrich, which she claimed, six different times, that it failed to meet her expectations.

43.   In May 2022, McAlpine filed a grievance with U-M regarding the

discriminatory treatment and hostile work environment created by Ulbrich, specifically mentioning sexual orientation bias, and discrimination and harassment based on his disability.

44.     Another requirement of Ulbrich's PIP was that McAlpine was to attend a Veritus Group Academy certification course for managers and executives.

45.     As such, McAlpine was successfully enrolled in the certification course, which ran from June 6, 2022 – September 2, 2022.

46.     On July 6, 2022, McAlpine was relieved of all duties during a Disciplinary Review Conference, which he was told was based on his alleged failure to meet the expectations in Ulbrich's PIP.

47.     On July 29, 2022, McAlpine's employment with U-M was terminated by Ulbrich for allegedly not meeting the expectations of her PIP.

48.     However, Ulbrich did not allow McAlpine to finish the requirements of her PIP, *i.e.*, as she terminated his employment in the middle of the certification course and refused to accept any of his six proposed "strategic visions."

49.     Upon information and belief, U-M failed to take any remedial action in response to McAlpine's grievance while McAlpine was still employed.

50.    On August 3, 2022, McAlpine filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that he was subjected to different terms and conditions of employment, discriminated against, and terminated in retaliation for his complaints of the same, based on: (1) his sexual orientation, gender, and complaints of the same, in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"); and (2) his disability and his complaints of the same, in violation of the Americans with Disabilities Act of 1990, as amended ("ADA").

51.    McAlpine intends to amend this Complaint in order to pursue claims under the ADA and Title VII after the EEOC issues the Notice of Right to Sue pertaining to those claims.

## COUNT I
## VIOLATION OF THE FAMILY MEDICAL LEAVE ACT

52.    Plaintiff incorporates the above paragraphs as if specifically repeated herein.

53.    At all times pertinent hereto, Plaintiff was an eligible employee within the meaning of the FMLA, 29 U.S.C.A § 2601 *et seq.*, as:

a) Plaintiff was employed by Defendant for a time period greater than 12 months;

b) During the aforementioned 12 months, Plaintiff worked greater than 1,250 hours.

54.    Defendant is an employer within the meaning of the FMLA, as it

10

employes greater than 50 employees within a 75-mile radius of Plaintiff's worksite.

55.    Pursuant to the FMLA, Plaintiff was entitled to take up to 12 weeks of FMLA leave as a result of his serious health condition.

56.    The FMLA requires that an employee give notice of their need for FMLA leave.

57.    The FMLA provides that an employee can take FMLA leave when a child is first placed with the employee for adoption to bond with their newly placed child.  § 2612(a)(1)(B).

58.    An employee's entitlement to leave for placement of child from adoption or foster care expires at the end of the 12-month period beginning on the date of the placement. § 2612 (a)(2).

59.    The FMLA prohibits an employer from interfering with, restraining, or denying the exercise of or the attempt to exercise FMLA rights. § 2615(a)(1).

60.    The FMLA prohibits retaliation against an employee who engages in protected activity pursuant to the FMLA. § 2615(a)(1).

61.    An employee's request for or inquiry about FMLA leave is a protected activity under the FMLA.

62.    The FMLA also prohibits retaliation against an employee who

opposes any practice made unlawful by the FMLA. § 2615(a)(2).

63.    Plaintiff took approved FMLA leaves for his disability, cancer, and related medical treatment on the following dates: December 19, 2019, through May 8, 2020; June 10, 2020, through September 30, 2020.

64.    Plaintiff gave Defendant notice that he was continuing to have serious medical issues that required further treatment.

65.    Plaintiff took approved FMLA leave to bond with his adopted child on the following dates: June 17, 2021, through July 18, 2021; August 16, 2021, through September 3, 2021.

66.    Plaintiff opposed Defendant's unlawful practices under the FMLA by making formal complaints and filing a grievance.

67.    Defendant violated the FMLA by:

    a)    Interfering with Plaintiff's FMLA-created right to take an adoption/FMLA leave and retaliating against Plaintiff for attempting to exercise his FMLA-created rights;

    b)    Interfering with Plaintiff's FMLA-created right to take a medical leave for his own serious medical condition and retaliating against Plaintiff for attempting to exercise his FMLA-created rights;

    c)    Retaliating against Plaintiff for engaging in protected conduct under the FMLA;

    d)    Retaliating against Plaintiff for opposing a practice that was unlawful under the FMLA;

    e)    Other FMLA violations which are yet to be discovered.

68.     There is a causal connection between Plaintiff's medical leave and adoption/FMLA leaves and his termination on July 29, 2022.

69.     Defendant willfully violated the FMLA in that it knew that such conduct was prohibited under the statute or acted in reckless disregard of whether such conduct was prohibited.

70.     As a direct and proximate result of Defendant's FMLA violations, Plaintiff has suffered, and in the future will suffer damages including, but not limited to, lost wages, employment benefits, and other compensation, past and future.

71.     Plaintiff has no plain, adequate or complete remedy at law for the actions of Defendant, which have caused and continue to cause irreparable harm.

72.     Pursuant to the FMLA, Plaintiff is entitled to:

   a)    All wages, salary, employment benefits, or other compensation denied or lost by reason of the violation of the FMLA;

   b)    Interest;

   c)    Liquidated damages;

   d)    Attorney fees;

   e)    Appropriate equitable relief;

   f)    Prospective injunctive relief;

g)      Appropriate declaratory relief;

h)      Other damages/remedies available under the law.

WHEREFORE, McAlpine prays for Judgment against Defendant, in whatever amount the Court or Jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, and attorney fees. McAlpine also seeks equitable relief including back-pay, front-pay, or other equitable relief the Court deems appropriate.

## <u>COUNT II</u>
## <u>VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT</u>

73.     McAlpine incorporates the above paragraphs as if specifically repeated herein.

74.     At all times relevant hereto, Defendant was an "employer" and Plaintiff was an "employee" within the meaning of the Elliott-Larsen Civil Rights Act (hereinafter referred to as the "ELCRA"), M.C.L. § 37.2101, *et seq.*

75.     The ELCRA prohibits an employer from discriminating against an employee on the basis of sexual orientation.

76.     The ELCRA also prohibits an employer from retaliating against an employee based upon the employee's protected conduct under the ELCRA.

77.     Notwithstanding the duties owed to McAlpine pursuant to the

ELCRA, Defendant discriminated against McAlpine, subjected him to a hostile work environment, took adverse action and retaliated against him because of his sexual orientation and complaints of the same, including, but not limited to:

  a)  Treating McAlpine differently than similarly situated employees due to his sexual orientation/gender, such as calling him a "lady," subjecting him to discriminatory questioning about his adoption, performing an inaccurate, insulting performance evaluation of McAlpine, unfairly placing him on a PIP, and terminating McAlpine's employment for allegedly not meeting the expectations of the PIP;

  b)  Subjecting McAlpine to a hostile work environment;

  c)  Failing to take prompt and appropriate remedial action after McAlpine complained about the discriminatory and harassing conduct;

  d)  Retaliating against McAlpine for his complaints;

  e)  Terminating McAlpine's employment;

  f)  Other acts of discrimination and retaliation to be determined through discovery.

78.  As a direct and proximate result of Defendant's discriminatory conduct toward McAlpine, McAlpine has suffered and will in the future suffer damages including, but not limited to:

  1.  Loss of wages and earning potential;

  2.  Loss of employee benefits;

15

3.    Loss of promotional opportunities;

4.    Loss of professional esteem and consequent damage to Wendt's professional career;

5.    Embarrassment, humiliation, inconvenience, mental anguish, indignity, outrage and disappointment;

6.    Exemplary damages;

7.    Other damages to be determined.

79.    Plaintiff also seeks equitable relief, including back-pay, front-pay, and other equitable relief the Court deems appropriate.

WHEREFORE, McAlpine prays for Judgment against Defendant, in whatever amount the Court or Jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, and attorney fees. McAlpine also seeks equitable relief including back-pay, front-pay, or other equitable relief the Court deems appropriate.

## COUNT III
## VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT

80.    McAlpine incorporates the above paragraphs as if specifically repeated herein.

81.    At all times relevant hereto, McAlpine was an "employee" and Defendant was an "employer" under the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"), M.C.L. § 37.1101 *et seq*.

82.    Defendant had a duty under the PWDCRA not to discharge or

otherwise discriminate or retaliate against Plaintiff in his employment on the basis of his disability, perceived disability, and/or history of disability, and his request for accommodations, and complaints of the same.

83.     At all times relevant hereto, McAlpine had a disability, was regarded by Defendant as having a disability, and/or had a history of a disability under the PWDCRA.

84.     McAlpine's disability did not affect his ability to perform the essential functions of his job, with reasonable accommodations.

85.     McAlpine's request for medical leave pursuant to the FMLA was also a request for reasonable accommodations under the PWDCRA.

86.     McAlpine's request for future time off for treatment or appointments related to his disability was also a request for reasonable accommodations under the PWDCRA.

87.     Defendant violated McAlpine's rights under the PWDCRA, and McAlpine's disability, perceived disability, and/or history of disability was a motive or reason that made a difference in Defendant's conduct, including, but not limited to, the following:

   a)     Discriminating against McAlpine due to his disability, perceived disability, and/or history of a disability;

   b)     Subjecting McAlpine to a hostile work environment based on his disability;

c) Failing to take prompt remedial action when McAlpine complained about the above discrimination;

d) Retaliating against McAlpine for his complaints and requests for reasonable accommodations;

e) Terminating McAlpine's employment;

f) Other acts of disability discrimination and retaliation to be determined through discovery.

88. As a direct and proximate result of Defendant's discriminatory conduct toward McAlpine, McAlpine has suffered and will in the future suffer damages including, but not limited to:

a) Loss of wages and other compensation, both in the past and in the future;

b) Loss of the value of benefits, both in the past and in the future;

c) Loss of earning capacity;

d) Loss of promotional opportunities;

e) Extreme embarrassment, humiliation, emotional distress, mental anguish, disappointment, outrage and indignity;

f) Exemplary damages;

g) Attorney fees;

h) Declaratory and injunctive relief;

i) Other injuries and damages that become known throughout the discovery process.

WHEREFORE, McAlpine prays for Judgment against Defendant, in

whatever amount the Court or Jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, and attorney fees. McAlpine also seeks equitable relief including back-pay, front-pay, or other equitable relief the Court deems appropriate.

## COUNT IV
## VIOLATION OF THE REHABILITATION ACT

89.    McAlpine incorporates the above paragraphs as if specifically repeated herein.

90.    At all times material hereto, Plaintiff was an "employee" of Defendant within the meaning of the Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*, and Defendant was an "employer" within the meaning of the Rehabilitation Act.

91.    Defendant is also a "program or activity" as defined by the Rehabilitation Act, i.e., "a college, university, or other postsecondary institution." 29 U.S.C. § 794(b)(2)(A).

92.    The Rehabilitation Act states that, "No otherwise qualified person with a disability in the United States...shall, solely by reason of...disability, be denied the benefits of, be excluded from participating in, or be subjected to discrimination under any program or activity receiving federal financial assistance."

93.    Defendant receives federal financial assistance through student loans, Pell Grants, and/or Medicare and Medicaid payments.

94.    By doing so, Defendant has waived immunity under the Rehabilitation Act.

95.    At all times relevant hereto, McAlpine had a disability, was regarded by Defendant as having a disability, and/or had a history of a disability under the Rehabilitation Act.

96.    Defendant had a duty under the Rehabilitation Act not to discriminate against McAlpine in his employment on the basis of his disability, perceived disability, and/or history of a disability, and his requests for accommodations.

97.    Defendant also had a duty not to retaliate against Plaintiff because of his objection to illegal discrimination based on his disability, and engaging in protected activity, in violation of the Rehabilitation Act.

98.    Defendant violated McAlpine's rights under the Rehabilitation Act, including, but not limited to, the following:

   a)    Discriminating against McAlpine due to his disability, perceived disability, and/or history of a disability;

   b)    Subjecting McAlpine to a hostile work environment based on his disability;

   c)    Failing to take prompt remedial action when McAlpine complained about the above discrimination;

      d)    Retaliating against McAlpine for his complaints and requests for reasonable accommodations;

      e)    Terminating McAlpine's employment;

      f)    Other acts of disability discrimination and/or retaliation to be determined through discovery.

99.    Defendant was aware of Plaintiff's protected acts under the Rehabilitation Act.

100.  As a direct and proximate result of Defendant's discriminatory conduct toward McAlpine, McAlpine has suffered and will in the future suffer damages including, but not limited to:

      a)    Loss of wages and other compensation, both in the past and in the future;

      b)    Loss of the value of benefits, both in the past and in the future;

      c)    Loss of earning capacity;

      d)    Loss of promotional opportunities;

      e)    Extreme embarrassment, humiliation, emotional distress, mental anguish, disappointment, outrage and indignity;

      f)    Attorney fees;

      g)    Other injuries and damages that become known throughout the discovery process.

101.  The above-referenced discriminatory and retaliatory conduct by

Defendant toward McAlpine was malicious, intentional and/or engaged in with deliberate indifference to McAlpine's federally protected civil rights and, as a result, McAlpine is entitled to compensatory and/or punitive damages.

102. McAlpine also seeks equitable relief, including back-pay, front-pay, and other equitable relief the Court deems appropriate.

WHEREFORE, McAlpine prays for Judgment against Defendant, in whatever amount the Court or Jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, and attorney fees. McAlpine also seeks equitable relief including back-pay, front-pay, or other equitable relief the Court deems appropriate.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff prays for damages in an amount to be determined at trial, together with interest, cost of suit, attorneys' fees, and all such other relief as the court deems just and proper which include:

a.   Declare that the aforementioned practices and actions of Defendant constitute unlawful employment practices in violation of the FMLA, ELCRA, PWDCRA, and the Rehabilitation Act.

b.   Award Plaintiff all lost wages, past and future, and other monetary damages to which he is entitled to including interest;

c.   Award Plaintiff compensatory damages;

d.    Award Plaintiff liquidated damages pursuant to the FMLA;

e.    Award Plaintiff punitive and exemplary damages;

f.    Award Plaintiff reasonable attorney's fees, costs, and interest;

g.    Award Plaintiff equitable relief including, but not limited to: an injunction directing Defendant to cease its discriminatory conduct and practices; full reinstatement to his employment and position with Defendant; and injunctive relief directing Defendant to provide Plaintiff his requested reasonable accommodations within a reasonable time; and

h.    Award such other relief as this Court deems just and proper and any other relief afforded under the FMLA, ELCRA, PWDCRA, and the Rehabilitation Act.

Respectfully submitted,

FAGAN MCMANUS, P.C.

By: /s/ Ryan O. Rosenberg
Ryan O. Rosenberg (P84530)
Attorney for Plaintiff
25892 Woodward Avenue
Royal Oak, MI  48067-0910
(248) 542-6300
rrosenberg@faganlawpc.com

Dated: April 10, 2024

## PLAINTIFF'S DEMAND FOR JURY TRIAL

NOW COMES the above-named Plaintiff, by and through his attorneys, FAGAN MCMANUS, P.C., and hereby demands trial by jury on the above matter.

FAGAN MCMANUS, P.C.

By: /s/ Ryan O. Rosenberg
    Ryan O. Rosenberg (P84530)
    Attorney for Plaintiff
    25892 Woodward Avenue
    Royal Oak, MI  48067-0910
    (248) 542-6300
Dated:  April 10, 2024    rrosenberg@faganlawpc.com